UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DEBORAH A. MCDONALD,

                Plaintiff,

-vs-                                Case No.  5:04-cv-428-Oc-10GRJ

ALPEN HOUSE LIMITED, CORP., a
foreign corporation d/b/a Adena Springs
South,

                Defendant.
_____

## O R D E R

    This Equal Pay Act and Title VII case is before the Court for consideration of Defendant Alpen House Limited, Corp.'s, ("Adena Springs"), Motion for Summary Judgment (Doc. 14), and Plaintiff Deborah A. McDonald's Response in Opposition (Doc. 28).   Adena Springs also filed a reply in support of their motion (Doc. 40), with Court permission.

    Ms. McDonald, a former exercise rider at Adena Springs' Ocala, Florida horse farm, claims that Adena Springs discriminated against her based on her gender (female), in violation of the Equal Pay Act provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *eq seq.,* ("EPA"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA").   Specifically, Ms.McDonald claims that Adena Springs paid her less than her

male counterparts who performed identical and/or substantially similar job duties.  (Doc. 1).[1]  Adena Springs seeks summary judgment on the grounds that it pays certain male exercise riders a higher salary due to a factor other than gender, and that it did not discriminate against Ms.  McDonald based on her gender.  Upon review of the case file and all relevant papers, and for the reasons that follow, the Defendant's Motion is granted in part and denied in part.

## Background and Facts

### A.    Adena Springs

Adena Springs is a horse farm located in Ocala, Florida.  The farm breeds and trains thoroughbred horses during their first two years for racing and sale.  The Adena Springs farm is comprised of eight barns, each of which can hold up to 36 horses.  The Farm's overall operations are run by a General Manager, Mark Roberts.[2]  The training aspect of Adena Springs is run by a Farm Trainer, an Assistant Trainer, and several Barn Managers.[3]  When operational, each barn is staffed with a Barn Manager, up to six exercise riders, and

---

[1]Plaintiff also asserted a Title VII claim of discriminatory termination because of her sex or gender, but that claim was abandoned at the August 24, 2005 pretrial conference.

[2]Deposition of Thomas Mark Roberts ("Roberts Dep."), Vol. 1 at 5:17-19.  Apparently several of the witness depositions were conducted in Canada, which uses a different format for transcripts. To avoid confusion, the Court will follow the citation method utilized by Adena Springs in its motion.

[3]Affidavit of Deborah A.  McDonald ("McDonald Aff."), ¶ 6; Roberts Dep., Vol.  1 at 5-9.

up to ten groomsmen.  During the busy season, each barn may also have an assistant barn manager.

Race horse training is primarily seasonal work.  In Ocala, the busy season for training is October through April.[4]  During that time, Adena Springs will have all eight barns filled and fully staffed.  During the rest of the year, however, only half of the barns may be filled.[5]  Because of the seasonal nature of the work at Adena Springs, employee turnover is both high and expected - particularly with respect to exercise riders.  Each season, Adena Springs hires several new riders to assist in the breaking and training of its horses. The Farm Trainer and Assistant Trainer conduct the majority of the hiring.[6]  However, the standard starting weekly salary for new riders is set by Roberts.  There is no set pay scale. Rather Roberts assesses what other horse farms pay their exercise riders and selects an appropriate rate.  Roberts also determines whether a particular rider should start at a rate above the standard.[7]

Adena Springs evaluates its exercise riders on a periodic basis, but does not consistently evaluate its riders on an annual basis and never shares its evaluations with

---

[4]Roberts Dep., Vol. 2 at 9:22-25; 10:1-8.

[5]Deposition of Kenneth Barber ("Barber Dep."), 4:24-25.

[6]Deposition of Danny Vella ("Vella Dep."), 3-4:20-21; Barber Dep., 4:29.

[7]Vella Dep., 8-9:42, 9-10:44-48, 10:49; Roberts Dep., Vol. 2, 14:12-25, 18:24-25, 19:1-24, 20:2-23.

3

its employees.[8]  Adena Springs also does not have any formal merit system or seniority

system in place for determining the amount of a rider's raise - it is determined on an ad hoc

basis by Roberts and the Farm Trainer based on their perception of each rider's abilities

and merit.[9]

## B.   Exercise Riders

Exercise riders are charged with preparing and training thoroughbred horses to race.

The training process consists of four components: (1) "breaking;" (2) "breezing;" (3)

galloping; and (4) starting gate work.[10]  "Breaking" a horse involves working with a one-year

old, or yearling, adapting the horse to wearing a saddle, bridle, and other riding gear, and

acclimatizing the horse to having a rider on them.[11]  "Breezing" refers to training the horse

to sprint - the exercise rider has the horse run a certain distance at a specified speed.[12]

Galloping involves working with the horse to become more accustomed to running at longer

---

[8] Roberts Dep., Vol.  1, at 13:5-20.  Adena Springs asserts that it evaluates all of its exercise riders after their first 60 days with the farm, and then again every January.  However, there is evidence that this process was not followed regularly, and Adena Springs produced very few evaluations during the discovery process.  See Plaintiff's Statement of Facts in Opposition to Defendant's Motion for Summary Judgment (Doc.  29), ¶¶ 19-20.

[9] Roberts Dep., Vol. 1, 12:20-21; Vella Dep., 7-8:37-38, 10:47-50.

[10] Vella Dep., 11:53; Barber Dep., 13-14:86-92; Deposition of Richard Purcell ("Purcell Dep."), 52:15-22, 53:14-25.

[11] Deposition of Edna Duran ("Duran Dep."), 20:14-19.

[12] McDonald Aff., ¶¶ 4-5; Barber Dep., 13-14:86-92.

distances, and to exercise the horse.[13]  And starting gate work involves training the horse to enter a race track starting gate and to break from it at the beginning of a race.[14]   All exercise riders at Adena Springs are required to perform these four training duties. However, some riders naturally perform certain aspects of the training process better than others.[15]  In addition, all exercise riders occasionally feed the horses and clean their stalls.

As can be expected, the job of an exercise rider can be dangerous.  Many of the horses have never worn riding gear or worked with a rider, and most have no experience with the confined quarters of a starting gate.   Some horses have trouble accepting the riding gear and riders, while others are more complacent.  As a result, exercise riders must be confident and able to control the horse to avoid injury.[16]

## C.   Deborah A. McDonald

Ms. McDonald is an exercise rider with approximately thirty years of experience training thoroughbred race horses.[17]  During her career, Ms. McDonald has worked at race tracks and farms in Kentucky, Illinois, and Florida.  She continues to work as an exercise

---

[13]McDonald Aff., ¶¶ 4-5; Barber Dep., 13-14:86-92.

[14]McDonald Aff., ¶¶ 4-5; Barber Dep., 13-14:86-92.

[15]Vella Dep., 19:97, 21:107.

[16]Affidavit of Danny Vella ("Vella Aff.") ¶ 6.

[17]McDonald Aff., ¶ 2.

5

rider in the Ocala area to date.[18]  Ms. McDonald approached Adena Springs in late 2000 about an exercise rider position.  Adena Springs hired her on November 30, 2000.[19]  Ms. McDonald was one of, if not the most, experienced exercise rider at Adena Springs.[20]

Ms. McDonald's immediate supervisor was her Assistant Barn Trainer.  Ms. McDonald worked at several of the barns while at Adena Springs, but her primary supervisors were Lee Murphy and Richie Purcell.  Her next level supervisor was the Assistant Trainer, Kenneth Barber.  Above him was the Farm Trainer, Danny Vella.[21]

While at Adena Springs, Ms. McDonald worked alongside 16-25 other exercise riders, 12-16 of whom were male.[22]  Each of these individuals held the same job title and performed all four of the training duties described above.  Ms. McDonald asserts that she excelled at all of her job duties.[23]  There is much dispute on this issue, however, as Adena Springs asserts that Ms. McDonald was, at best, an average rider who was not able to adequately perform the more challenging aspects of her job, and had become nervous and "lost her heart" with respect to the more difficult horses during the last few months of her

---

[18]McDonald Aff., ¶¶ 2, 8.

[19]Deposition of Deborah A. McDonald ("McDonald Dep."), 24:15-21.

[20]McDonald Aff., ¶ 3.

[21]McDonald Aff., ¶ 4; Roberts Dep., Vol.  1, at 5-9.

[22]Martin Aff., Exh.  1; Appendix 1 to Adena Springs' Reply Brief (Doc.  40) ("Appendix 1").

[23]McDonald Dep., 48:22-24.

employment.[24]  Adena Springs also asserts that it routinely allowed Ms. McDonald to select "easier" horses to train, and steered her away from starting gate work, breaking horses, and from working with the more difficult horses given her lackluster job performance.[25] There is conflicting testimony on this topic as well: there is some evidence that Ms. McDonald performed all four training functions at various times;[26] another witness testified that all exercise riders worked with the more difficult horses equally,[27] and another witness testified that the male and female riders possessed equal skills.[28]

At the time of her hiring, Ms. McDonald received the standard starting salary for new employees of $415 per week.[29]  Ten other exercise riders started at Adena Springs in 2000 as well: six females and four males.  Of these ten individuals, only one male - Ruben Flores - received a higher starting salary than Ms. McDonald of $430.[30]  Roberts determined this

---

[24] See Vella Dep., 14-15:71-72, 17:80-84; Barber Dep., 15:101, 16:103, Purcell Dep., 9:3-19, 35:13-14; Roberts Dep., Vol. 1, 13:21-25, 14:1-10; Duran Dep., 24:8-25, 25:1-14.

[25] See Vella Dep., 23:111-12; Purcell Dep., 10:22-24, 26:16-23, 27, 28:1-3. Ms. McDonald disputes Adena Springs' characterization of her job performance, and claims that she was never counseled about any performance issues. McDonald Aff., ¶ 7. The only written warning against Ms. McDonald related to excessive absences in 2001.

[26]See, e.g., Vella Dep., 14:71, 21:105-06.

[27]Affidavit of Robert Shinn ("Shinn Aff."), ¶ 4.

[28]Deposition of Tescha Von Bleucher ("Bleucher Dep."), 12:10-16.

[29]Roberts Dep., Vol. 2 at 13:2-8; Vella Dep., 9:43.

[30]See Attachment 1 to Motion; Affidavit of Heather Martin ("Martin Aff."), Exh. 1; Appendix 1 to Adena Spring's Reply Brief (Doc. 41).

7

salary was appropriate because Flores "was known" to Adena Springs, while Ms. McDonald was an "unknown."[31]  In addition, two females, Megan Cooke and Tonya Tozzi, started at a lower salary of $400 per week, and another, Rudi Baker, started at a higher salary of $435 per week.[32]  All other riders hired in 2000 started at the standard salary of $415 per week.  Ms. McDonald's starting salary was, however, substantially lower than the salaries of eight other male exercise riders, who were already employed at Adena Springs.[33]

During her employment with Adena Springs, Ms. McDonald also received several pay raises.  On January 15, 2001, her salary increased to $430 per week.  It increased again to $450 per week on November 13, 2001 and again to $470 per week on May 3, 2002.  However, these salary increases were not as large as the pay raises other male exercise riders received who began their employment at the same time as Ms. McDonald.  For example, Norman Belanger began at the same starting salary as Ms. McDonald on October 2, 2000.  He received an almost immediate increase to $450 per week on October 25, 2000, to $475 per week on March 1, 2001, and to $490 per week on March 20, 2002.  John Fennessy received similarly larger pay raises: he went from a starting salary of $415

---

[31] See Affidavit of Thomas Mark Roberts, dated June 22, 2005 ("Roberts 6/22/05 Aff."), ¶ 4; Affidavit of Danny Vella ("Vella Aff."), ¶ 3.

[32] Attachment 1 to Motion; Martin Aff., Exh. 1.

[33] Attachment 1 to Motion; Martin Aff., Exh. 1; Appendix 1.  These male riders had been with the farm prior to Ms. McDonald for various lengths of time, from a few months to a few years.

per week on October 10, 2000 to $475 on November 17, 2000 and again to $490 on February 24, 2002. Ruben Flores' compensation also increased at a much faster rate than Ms. McDonald's: between October 20, 2000 and October 5, 2002, his pay increased five times from $430 per week to $525 per week.[34]

In addition, Ms. McDonald's salary throughout her tenure at Adena Springs was significantly lower than numerous other male exercise riders, at least two of whom started their employment after Ms. McDonald.[35] And, overall, male exercise riders are typically paid more than female exercise riders.[36]

In February 2003, Adena Springs informed Ms. McDonald that she would no longer train their horses.[37] She was offered two other positions at the farm - one as a groomsman, and another working in the foaling area.[38] Both positions paid less than her current salary. Ms. McDonald declined both positions, and her employment with Adena Springs terminated on February 8, 2003.

## D.   Procedural History

---

[34]Martin Aff., Exh. 1; see also Appendix 1.

[35]Ms. McDonald was consistently paid less than 7-10 male exercise riders, two of whom began their employment after Ms. McDonald. Frank Griffis began working for Adena Springs on January 28, 2003 at $500 per week, and Jose Romero began employment with Adena Springs on January 29, 2003, at the same amount. See Appendix 1.

[36] Martin Aff., Exh. 1; Appendix 1.

[37]Vella Dep., 25:116, 26:123; Purcell Dep., 10:1-13.

[38]Vella Dep., 25:116-19; Purcell Dep., 10:5-9.

Within 300 days of her termination, Ms. McDonald filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Adena Springs engaged in wage discrimination in violation of the EPA and Title VII, and terminated her employment due to her gender.  The EEOC subsequently issued a letter of determination, finding reasonable cause to believe Ms. McDonald's allegations.  The EEOC issued a Notice of Right to Sue on June 22, 2004, and Ms. McDonald filed her Complaint in this action on September 21, 2004.  (Doc. 1).

In her Complaint, Ms. McDonald asserts that Adena Springs paid her a lower salary than her male counterparts who performed substantially identical work, in violation of the EPA, Title VII, and the FCRA.  She seeks relief in the form of back pay, compensatory damages, punitive damages, attorneys' fees and costs, and an injunction prohibiting Adena Springs from engaging in future gender discrimination.

Following the completion of discovery, Adena Springs filed the instant Motion for Summary Judgment on June 22, 2005.  The motion became ripe for review on August 15, 2005.

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  <u>Samples on Behalf of Samples v. Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  <u>Rollins v. Techsouth</u>, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## Discussion

### A.  EPA and Title VII Wage Discrimination Standards[39]

Although a claim for wage discrimination may be brought simultaneously under both the EPA and Title VII, the standards of proof differ in several key respects.  Under the EPA, an employee demonstrates a *prima facie* case of wage discrimination by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require "'equal skill, effort, and responsibility, and which are performed under similar

---

[39]The FCRA was patterned after Title VII and federal case law interpreting Title VII is applicable to cases arising under the FCRA.  <u>See</u> <u>Joshua v. City of Gainesville</u>, 768 So.2d 432, 435 (Fla.  2000); <u>Brown Distrib. Co.  of West Palm Beach v. Marcell</u>, 890 So.2d 1227, 1230, n. 1 (Fla.  4th DCA 2005).  Accordingly, the same analysis used to assess Ms.  McDonald's Title VII claims will apply to her FCRA claims.

working conditions.' "Irby v. Bittick, 44 F.3d 949, 954 (11th Cir.1995) (quoting Corning

Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) and

29 U.S.C. § 206(d)(1)).   Once the employee presents a *prima facie* case, the employer

may avoid liability by proving by a preponderance of the evidence that the pay differences

are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures

earnings by quantity or quality of production; or (iv) ... any other factor other than sex."  29

U.S.C. § 206(d)(1). The burden to prove these affirmative defenses is heavy and the

employer must demonstrate that " 'the factor of sex provided *no basis* for the wage

differential.' " Irby, 44 F.3d at 954 (quoting Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590

(11th Cir.1994)). Further, the employer must show that none of the decision-makers,

whether in middle or upper management, were influenced by gender bias.  See Anderson

v. WBMG-42, 253 F.3d 561, 566 (11th Cir.2001).

   If the employer meets this burden, the employee "must rebut the explanation by

showing with affirmative evidence that it is pretextual or offered as a post-event justification

for a gender-based differential." Irby, 44 F.3d at 954.  If the employer fails to meet this

burden, the employee wins.  In essence, claims under the EPA create a form of strict

liability against the employer - the employee is not required to prove discriminatory intent

on the part of the employer.  Miranda v.  B&B Cash Grocery Store, Inc., 975 F.2d 1518,

1533 (11th Cir.  1992).

In contrast, a claim for sex discrimination under Title VII follows the same burden-shifting analysis of the Supreme Court's disparate treatment cases, such as McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).   See Miranda, 975 F.2d at 1528 (holding that these decisions provide "the appropriate framework for evaluating [a] claim of gender-based wage discrimination" under Title VII).   And, unlike claims brought under the EPA, the McDonnell Douglas/Burdine framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer.   EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1570 (11th Cir.1993); Miranda, 975 F.2d at 1529.

Under the McDonnell Douglas/Burdine approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by merely showing that she occupies a job similar to that of higher paid males.   Miranda, 975 F.2d at 1529.   Once a *prima facie* case is established, the defendant must articulate a "legitimate, non-discriminatory reason for the pay disparity." *Id.* (citing Burdine, 450 U.S. at 255-56, 101 S.Ct. at 1095).   This burden is "exceedingly light"; the defendant must merely proffer non-gender based reasons, not prove them. *Id.* (quoting Perryman v. Johnson Prod., Inc., 698 F.2d 1138, 1142 (11th Cir.1983)). Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must show that "a discriminatory reason more likely than not motivated

13

[the employer] to pay her less." Id. (citing Burdine, 450 U.S. at 256, 101 S.Ct. at 1095). Such proof may be direct or circumstantial.  Reichhold Chem., 988 F.2d at 1564 (citing Smith v. Horner, 839 F.2d 1530, 1536 (11th Cir.1988)); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ( "[R]ejection of the defendant's proffered reasons [for disparate treatment], will *permit* the trier of fact to infer the ultimate fact of intentional discrimination...." (emphasis in original)).

In the present case, material issues of fact exist under both theories of liability, thereby preventing summary judgment.

## B.    *Plaintiff's Prima Facie Case of Wage Discrimination*

Initially, neither side disputes that Ms. McDonald has demonstrated a *prima facie* case of wage discrimination under both the EPA and Title VII.  She is a female, and is paid less than her male counterparts who perform substantially equal work, under similar working conditions.[40]   However, Adena Springs confuses the issue by arguing that its justification for these pay discrepancies is due to the fact that Ms. McDonald *did not* hold the same job as her male counterparts - which would mean that she did not establish a *prima facie* case.  It appears that Adena Springs is referring to the fact that it believed Ms. McDonald was only an average rider and was not able to work on the more challenging and difficult horses, thereby separating herself from some of the more skillful riders.  See

---

[40]Because Ms. McDonald can establish this more difficult burden of proof under the EPA, she clearly also meets the lesser burden under Title VII of proving that she performed a job similar to that of higher paid males at Adena Springs.

Motion at 19-21.  Despite the fact that Ms.  McDonald's standard of performance is in dispute, such a distinction does not defeat Ms. McDonald's *prima facie* case.   Rather, a plaintiff establishes a *prima facie* case "by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." Miranda, 975 F.2d at 1533.  At this stage "the jobs and not the employees are compared, [therefore] only the skills and qualifications actually need to perform the jobs are considered."  Id.

At bottom, it is undisputed that Ms.  McDonald held the same exercise rider position as other male employees at Adena Springs, and was responsible for performing the same four training duties as all other exercise riders - both male and female.  Her abilities, and/or deficiencies in performing her job duties may go towards proving one of the four statutory factors set forth in the EPA to justify pay differentials (as well as to prove a lack of discriminatory intent under Title VII), but it has no weight at the *prima facie* case stage.

**C.**    ***Adena Springs' Justification for the Pay Differentials***

Once Ms.  McDonald establishes her prima facie case - under either the EPA or Title VII, the burden shifts to Adena Springs to prove either (a) that its pay differentials are based on one of the four statutory factors set forth under § 206 of the EPA, or (b) that the pay discrepancies are due to a legitimate, non-discriminatory reason (for purposes of Title VII).   For purposes of the EPA, Adena Springs asserts that its decision to pay Ms. McDonald a lower salary was based on a "factor other than sex."

The "factor other than sex" exception to the EPA applies "when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." Glenn v. General Motors Corp., 841 F.2d 1567, 1571 (11th Cir. 1988). In this case, Adena Springs points to two factors other than sex: (1) the "fact" that Ms. McDonald was a poor performer in comparison to her male counterparts, thereby justifying a lower salary; and (2) that several of the male exercise riders began their employment prior to Ms. McDonald's hiring, thereby earning a higher salary. Adena Springs proffers these same reasons for purposes of its burden under Title VII.

With respect to the first factor - Ms. McDonald's alleged poor job performance, Adena Springs has provided her performance evaluations, as well as several evaluations of other exercise riders employed at the same time as Ms. McDonald.[41] According to Adena Springs, these evaluations demonstrate that Ms. McDonald was a much lower caliber of exercise rider than her male counterparts. Adena Springs has also presented testimony from its managers and employees that male exercise riders Robert Shinn, John

---

[41]See Affidavit of Mark Roberts, dated August 15, 2005 ("Roberts 8/15/05 Aff."), Exhs. 1, 3-6. The Court notes that on August 17, 2005, two days *after* the deadline for filing its reply in response to its motion for summary judgment, Adena Springs filed the affidavit of Mark Roberts and seven exhibits - consisting of various performance evaluations for Ms. McDonald and several male comparators, and additional salary information (which in some ways contradicts the salary information previously provided). While the Court reviewed and considered these materials in deciding the motion for summary judgment, Adena Springs is admonished that Court deadlines are not to be ignored, and will be strictly enforced in the future. The Court is further concerned as to why these materials - which obviously go to the heart of Adena Springs' defense, were not submitted as part of the initial motion for summary judgment.

Fennessy, Efrain Duran, Darren Hoek, and Ruben Flores were "go to guys" - who would voluntarily take on the more difficult horses and tasks.[42] This evidence, according to Adena Springs, justifies the higher salaries paid to its male exercise riders.

Aside from the fact that Adena Springs has already admitted that it has no formal merit-based system for assessing compensation,[43] the evidence presented by Adena Springs does not indicate that Ms. McDonald was not able to perform her job duties.  In fact, she only received one "poor" rating in the area of "cooperation with others" on one evaluation throughout her tenure with Adena Springs,[44] and several male exercise riders also received "average" or "fair" ratings.[45]  The only other criticism is that she allegedly "lost her heart" - *i.e.,* she became nervous while training the horses and would not work with the more dangerous horses.   Such a criticism is highly subjective and easily disputable; for example, Danny Vella, the Farm Trainer at Adena Springs during Ms.  McDonald's employment, testified that she was an "average or pretty good" rider, and that any nervousness did not present itself until the last few months of her employment.[46]  Thus, this alleged nervousness might help explain the pay discrepancy right before her termination,

---

[42]See, e.g., Duran Dep., 35:2-25, 36:1-7; Affidavit of Danny Vella, ¶¶ 4-5, 7, 9-10, 16-17.

[43]Adena Springs concedes that it has no formal merit system and therefore does not assert that statutory defense under the EPA.  See also Roberts Dep., Vol. 2,  21:1-23.

[44]Roberts 8/15/05 Aff., Exh.  1.

[45]Roberts 8/15/05 Aff., Exhs.  3-7.

[46]Vella Dep., 16-17:78-84.

17

but is not an adequate justification for the pay discrepancy between Ms.  McDonald and her male counterparts during the first several years of her employment.   Moreover, witnesses for both sides testified that Ms. McDonald performed all of her job duties throughout her employment, including working with dangerous horses.[47]   And, the fact that Ms. McDonald never received any sort of discipline or counseling on her performance (other than a single warning in February 2001 concerning her attendance), further casts doubt on Adena Springs' claim that she was a poor performer.[48]

The "go to guy" rationale also suffers from various factual disputes.  Notably, Adena Springs has submitted no formal policy explaining to employees that certain training duties are more valuable to the farm than others, and that exercise riders who perform these more valuable and/or difficult tasks will be compensated at a higher rate.   Moreover, Ms. McDonald has presented evidence, in the form of an affidavit from Robert Shinn, which casts serious doubt on Adena Springs' "go to guy" rationale.  In particular, Mr.  Shinn states that - contrary to Adena Springs' characterization - he was not a "go to guy," he did  not take on any more difficult tasks than the next rider, and all riders took their "fair share" of

---

[47]Shinn Aff., ¶¶ 4, 6; see also Vela Dep., 21:105-06.

[48]Roberts 8/15/05 Aff., Exh.  2; McDonald Aff., ¶¶ 7-8.  Adena Springs asserts that it regularly counseled Ms.  McDonald on her performance, however, that issue is in dispute, and there is no documentary evidence to support this claim.  It appears that the disciplinary process set forth in Adena Springs' employee handbook was not regularly adhered to.  In addition, the employee evaluation process was sporadic at best.  Many employees were not evaluated on a regular basis, and the evaluations presented to the Court present an incomplete picture.

the difficult horses.[49]   Mr.  Shinn also states that Mr.  Duran, another alleged "go to guy"

paid more than Ms.  McDonald, was, in Mr.  Shinn's observation, unable to perform all of

his training duties given his physical size.[50]   To be sure, Mr.  Shinn was not a manager

responsible for evaluations or salaries, but his first-hand observations of exercise riders at

Adena Springs during the time of Ms.  McDonald's employment places Adena Springs'

justifications for paying Ms.  McDonald a lower salary in dispute.

Ms. McDonald has also presented deposition excerpts from Tescha Von Bluecher,

an assistant barn trainer who began work at Adena Springs during the last few months of

Ms.  McDonald's employment.  According to Ms.  Bluecher, there was no difference in the

skills and abilities of male and female exercise riders at Adena Springs - once again

casting doubt on Adena Springs' "go to guy" rationale.[51]   Moreover, this rationale does not

explain why Adena Springs paid higher salaries to several other male riders who were not

"go to guys."  Nor does it explain why men as a whole were paid on average higher salaries

than female exercise riders.

---

[49]Shinn Aff., ¶¶ 4, 6.

[50]Shinn Aff., ¶ 5.

[51]Bluecher Dep., 12:10-16.  Notably, Adena Springs has not submitted any resumes or job applications for its exercise riders, or any other proof which would demonstrate that certain male exercise riders possessed additional skills, experience, or abilities lacking in Ms.  McDonald. Instead, the Court is left with purely subjective opinions as proof that certain male exercise riders performed at a higher level than Ms.  McDonald.

Adena Springs' second "factor other than sex" which it contends justifies its salary decisions is based on an employee's tenure at Adena Springs.  Aside from the fact that this rationale does not address male riders who started at the same time or after Ms. McDonald, Adena Springs has already admitted that it does not have any formal, established seniority policy for purposes of determining compensation.  And, if it is Adena Springs' intent to argue that male exercise riders were paid more because they were more experienced, such an argument fails due to the undisputed fact that Ms.  McDonald has more than 30 years of experience in race horse training - the most experience of any exercise rider at Adena Springs.

Rather, Adena Springs has not attempted to explain its rationale for setting salaries, other than to state that it is Roberts' practice to make an independent judgment call, based on his impression, and the Farm Trainer's impression of the employee's abilities and performance.   This complete lack of any policy or other documentation on how compensation is determined,[52] means that this case will instead hinge on an assessment of the truthfulness of Ms.  McDonald and her witnesses against Adena Springs and its witnesses.  Such an assessment is the job of the jury.[53]

---

[52]For example, Adena Springs has not provided a copy of its employee handbook, nor has it provided any evidence of market rates for male exercise riders, or proof that the alleged "go to guys" were in danger of leaving for competitors.

[53]Adena Springs' reliance on Hammock v.  Nexcel Synthetics, Inc., 201 F.  Supp.2d 1180 (N.D. Ala.  2002) is misplaced.  In that case, the employer had submitted evidence demonstrating that each male comparator either had more experience and/or education than the plaintiff, or that

(continued...)

In addition, these same issues of material fact prevent a finding that Adena Springs did not act with discriminatory intent for purposes of Ms. McDonald's Title VII claim. While Adena Springs' reasons for paying Ms. McDonald a lower salary than male exercise riders are sufficient to meet the "exceedingly light" burden under Title VII of rebutting Ms. McDonald's prima facie case, there exist sufficient issues of material fact at this stage in the litigation to place the veracity of these reasons in doubt

To conclude, the Court is not holding that sex discrimination played a factor in Ms. McDonald's salary determination. The Court is only holding that Adena Springs has not yet met its burden of persuading a fact finder that sex played no role. Given the lack of any standards for determining pay rates and raises, the conflicting witnesses testimony and affidavits presented to the Court to date, the lack of an established merit or seniority policy or practice, or adhered-to evaluation and disciplinary process, resolution of Ms. McDonald's EPA and Title VII claims will essentially turn on the fact-specific and fact-contested issue of Ms. McDonald's performance, in comparison with the performances of Adena Springs' male exercise riders. This will, in turn, place the credibility of both sides' witnesses at

---

[53](...continued)
the male comparators were paid more because they were part of a planned advancement program. Further, the plaintiff in Hammock did not attack these reasons head on. In contract, Adena Springs has presented no evidence that any male comparator had more experience than Ms. McDonald, and Ms. McDonald has directly attacked the rationales set forth by Adena Springs. Similar factual differences make Adena Springs' reliance on Feazell v. Tropicana Products, Inc., 819 F.2d 1036 (11th Cir. 1987) equally misplaced.

issue.  And, while the Court does not believe that Ms. McDonald will have an easy time proving her claims, such determinations are best left for a jury to resolve.[54]

**D.    Plaintiff's Discriminatory Termination Claim (Count II)**

In Count II of her Complaint, Ms.  McDonald alleges that she was involuntarily terminated from her employment at Adena Springs due to her gender, in violation of Title VII and the FCRA.  In its motion for summary judgment, Adena Springs represents that Ms. McDonald has abandoned this claim.  Ms.  McDonald has not objected to or otherwise responded to this assertion, and at the August 24, 2005 pretrial conference, her counsel confirmed that she has in fact abandoned this claim.  Therefore, summary judgment in favor of Adena Springs is appropriate as to Ms.  McDonald's termination claim.

## CONCLUSION

A ccordingly, for the reasons set forth above, it is hereby ORDERED that:

1.    Defendant Alpen House Limited, Corp's Motion for Summary Judgment (Doc. 14) is DENIED as to Count I of Plaintiff Deborah McDonald's Complaint;

2.    Defendant Alpen House Limited, Corp's Motion for Summary Judgment (Doc.  14) is GRANTED as to Count II of Plaintiff Deborah McDonald's Complaint;

---

[54]The Court is aware that Adena Springs has filed a motion (Doc.  35) seeking to strike Ms. McDonald's expert witness report and portions of Adena Springs' expert witness report which Ms. McDonald attached in support of her opposition to summary judgment.  That motion is not yet ripe. However, the Court found these excerpts to be extremely confusing and did not rely upon them in preparing this Order.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 24th day of August, 2005.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:    Counsel of Record
              Maura McSheehy